**UNITED STATES of America, Plaintiff,**

v.

**Michael SCHETZ, Defendant.**

**No. 87 CR 981–4.**

United States District Court,
N.D. Illinois, E.D.

Nov. 3, 1988.

Laurie Barsella, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Dennis M. Cooley, Chicago, Ill., for defendant.

## CORRECTED MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

All defendants have either pleaded guilty or been convicted at trial, and now face sentencing under the Sentencing Reform Act of 1984 ("the Sentencing Act"), Pub.L. No. 98–473, 98 Stat. 1837, *codified at*, 28 U.S.C. § 991 et seq. The Act requires this court to sentence them under the Sentencing Guidelines promulgated by the United States Sentencing Commission, *see* 18 U.S. C. § 3553, unless doing so would violate the Constitution. Defendants insist that it would, and thus move this court to invalidate the guidelines and sentence them under pre-Act procedures.

Since the guidelines went into effect on November 1, 1987, over two hundred and fifty district courts have ruled on their constitutionality. 57 U.S.L.W. 3179; *see United States v. Bogle*, 855 F.2d 707, 709 n. 3 (11th Cir.1988) (listing cases and results). Recently, a Ninth Circuit panel cast its vote, *Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (1988), and on October 5 the Supreme Court heard oral arguments on its first guidelines case. *United States v. Mistretta*, 682 F.Supp. 1033 (W.D.Mo.), *cert. granted*, —— U.S. ——, 108 S.Ct. 2818, 100 L.Ed.2d 920 (1988); *see* 57 U.S.L.W. 3271 (summarizing arguments). In light of this plethora of judicial pronouncements on the guidelines, this court need not describe their provisions nor expound at length on the constitutional problems they raise. At the same time, however, the court agrees with courts throughout the country that it would be unwise to abstain from sentencing altogether pending the Supreme Court's decision. Accordingly, the court will rule on defendants' motion, but without the detailed analysis which a constitutional challenge to an Act of Congress ordinarily receives.

## DISCUSSION

Defendants metaphorically describe the constitutional issues here as a ball, and portray the defect in the government's defense of the Act as the inability to fit the Act's provisions into the ball without a lump protruding somewhere. The most important constitutional attacks on the Act, however, can be set forth linearly, making for a less sophisticated but simpler analysis.

According to defendants, the promulgation of

(1) binding sentencing guidelines (2) by a Commission (3) comprised of three judges (4) appointed and removable by the President

violates, respectively,

(1) the due process clause, (2) the non-delegation doctrine, (3) Article III, and (4) the separation of powers doctrine.

(1) *Binding Sentencing Guidelines Do Not Violate Due Process.*

■ The unquestioned power of Congress to establish minimum and maximum sentences for particular crimes renders the due process challenge to the guidelines untenable. The Supreme Court has stated repeatedly that, "in non-capital cases, the established practice of individualized sentences rests not on constitutional commands but on public policy enacted into statutes." *Lockett v. Ohio*, 438 U.S. 586, 605–06, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *see also, Gubiensio–Ortiz v. Kanahele*, 857 F.2d at 1269 (9th Cir.1988) (Wiggins, J., dissenting). Defendants, as well as many judges, may prefer a system in which the court has nearly unbridled discretion to impose the sentence it deems appropriate, but as a matter of constitutional law, this preference is irrelevant.

(2) *Congress Did Not Violate the Non–Delegation Doctrine By Authorizing the Commission to Establish Binding Guidelines.*

■ The notion that there exist certain legislative powers which Congress may not

delegate to another branch or to an independent commission has theoretical force but little doctrinal support. *See generally* Tribe, *American Constitutional Law* § 5–17 (2d ed. 1988). Even the two cases establishing the doctrine, *A.L.A. Schechter Poultry v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), held only that Congress had provided insufficient guidance to non-legislative bodies; they did not prohibit Congress from delegating its powers so long as adequate policy directives accompanied the delegation: *

> We pointed out in the *Panama Company* case that the Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.

*A.L.A. Schechter Poultry v. United States*, 295 U.S. at 530, 55 S.Ct. at 843; *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430, 55 S.Ct. 241, 252, 79 L.Ed. 446 (1935) ("As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule."); *see also Industrial Union Department v. American Petroleum Institute*, 448 U.S. 607, 685–86, 100 S.Ct. 2844, 2885–86, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring in judgment) (non-delegation doctrine ensures that Congress makes the "important choices of social policy," that the recipient of delegated authority has "intelligible principles" to guide the exer-

cise of discretion, and that courts "will be able to test that exercise against ascertainable principles").

Where Congress has provided adequate guidelines, courts have upheld delegations authorizing non-legislative bodies to define crimes (*United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563), to set dates for release from prison (*Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1212–13 (3d Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984); license television and radio stations (*e.g., National Broadcast Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943), and to recover excess profits (*Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). Although such delegations, implicating interests at the core of constitutional freedoms, are narrowly construed to ensure that the administrators conform to the Congressional mandate, they have never been ruled beyond the power of Congress to authorize. *See* Tribe § 5–17, at 365–66 (discussing cases).

In light of these precedents, this court cannot agree that the Congress violated the non-delegation doctrine in its authorization to the Commission to promulgate binding sentencing guidelines in criminal cases. The Sentencing Act grants the Commission a great deal of discretion in establishing guidelines, but the commission remains bound by the maximum and minimum sentences imposed by the criminal statutes, and sets forth both the procedures the Commission must employ and the substantive factors it must apply in arriving at the sentencing ranges. *See, e.g.,* 28 U.S.C. § 994(c)(2), (4), (6).

---

* The parties in this case have approached the nondelegation doctrine as consisting of two subdoctrines: first, that certain legislative powers—e.g., the power to set criminal penalties—are *per se* non-delegable; second, that even delegable powers may not be delegated without proper Congressional guidance. Some courts have distinguished between these two doctrines by calling the former the "non-delegation doctrine", and the latter the "excessive delegation doctrine". *See, e.g., United States v. Eastland*, 694 F.Supp. 512 (N.D.Ill.1988) (Aspen, J.) (striking down the guidelines under both doctrines).

Other courts have used "the non-delegation doctrine" in referring to both principles, but have employed the term "core functions" as describing those legislative powers which are *per se* non-delegable. *See, e.g., Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C.) (three-judge panel including Judge Scalia) (rejecting "core functions" analysis as standardless), *aff'd sub nom., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). The Supreme Court has never distinguished between these two concepts, reviewing all legislative delegations under the same general test.

Courts striking down the guidelines under the nondelegation doctrine have expressed their gravest concern with the Commission's statements to the effect that it believed the statute authorized it to reinstitute a federal death penalty. Since the Commission ultimately chose not to do so, that issue is not currently before this court. *See, e.g., United States v. Eastland,* 694 F.Supp. 512 (N.D.Ill.1988) (Aspen, J.). Yet, as noted above, numerous Supreme Court opinions over the past fifty years strongly suggest that this problem, had it arisen, could have been addressed by narrowly construing the Congressional mandate and striking down the Commission's action as beyond the scope of its delegated authority. *See, e.g., National Cable Television Association, Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) (narrowly construing FCC's authority to collect fees so as to avoid "taxing power" problem); *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed. 2d 1204 (1958) (refusing to construe legislation as authorizing Secretary of State to deny passports based on Communist affiliations).

(3) *The Sentencing Act Violates Article III By Requiring Three Federal Judges to Serve on the Commission.*

█ The Constitution vests the federal judicial power in the Supreme Court and the lower federal courts, Article III, § 1, and limits that power to the resolution of "Cases" and "Controversies". Article III, § 2; *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Gubiensio-Ortiz v. Kanahele,* 857 F.2d at 1251 (1988). The judiciary may establish procedural rules to govern cases and controversies properly before it, *see* 28 U.S.C. § 2071 (1982), and may impose sanctions on individuals ignoring these rules, *Young v. United States ex rel. Vuitton et Fils, S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987). It may not, however, whether on its own or in participation with the other branches, promulgate substantive laws governing "the primary conduct and affairs of ...

citizens." *Hanna v. Plumer,* 380 U.S. 460, 476, 85 S.Ct. 1136, 1146, 14 L.Ed.2d 8 (1965) (Harlan, J., concurring). "The purpose of this limitation is to help ensure the independence of the Judicial Branch and to prevent the judiciary from encroaching into areas reserved for the other branches." *Morrison v. Olson,* 108 S.Ct. at 2612.

It is true that the substance/procedure dichotomy arose in cases involving questions of federal versus state power, *see Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), and that the line between them is not always easy to define. But the dichotomy has proven applicable in cases raising Article III problems, *see Gubiensio–Ortiz v. Kanahele,* 857 F.2d at 1252–55, and this case falls squarely on the substantive side. The Sentencing Guidelines do not merely establish the procedures judges must use in imposing sentences. Instead, they set forth substantive parameters for the sentences, with the available procedures for challenging them governed by the substantive result. *See* Federal Rule of Criminal Procedure 32; *see also Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (state sentencing guidelines impact on substantive rights).

Thus, the only remaining question is whether the required presence of three federal judges on the Commission involves the judiciary in the promulgation of the guidelines. It does. The government attempts to equate the federal judges on the Commission with judges who in the past have served as Presidential advisors, as ambassadors and as other non-judicial officials, noting that Article I provides that "no Person holding any Office under the United States, shall be a Member of either House [of Congress] during his Continuance in Office," Article I, § 6, whereas no such limitation applies to judges. But the equation does not hold.

The judges on the Commission are not merely qualified citizens who happen to be judges; they are Article III judges who happen to be qualified commissioners. They serve not as individuals, but as representatives of the judiciary. Two hundred years ago, the drafters of the Constitution

 

soundly rejected a Council of Revision—a proposed body composed of the President and the Justices of the Supreme Court with the power to veto Congressional legislation—on the grounds that it would create "an improper coalition between the Executive and the Judiciary departments." I Farrand, *Records of the Federal Convention 1787* 79; *see Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir.1988) (discussing in detail the dangers of intermingling the judiciary in the functions of the other branches). The fact that the justices would not have been ruling from the bench when they acted in their roles on the Council did not render this function non-judicial. Indeed, unless the Article III limitation on the judicial power is meaningless—i.e., judges can decide only cases and controversies unless they are doing something else, in which case they are not serving as judges—the participation of three federal judges in the work of the Commission constitutes judicial action, and thereby violates Article III's limitation on such action to the resolution of cases and controversies.

(4) *The President's Authority to Appoint and Remove the Commissioners, Including the Three Federal Judges, Violates Separation of Powers Principles.*

■ In addition to the Article III problems with having judges serve on the Commission, the President's power to appoint and remove the commissioners violates fundamental separation of powers principles. In *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Supreme Court struck down a provision of legislation which gave Congress the power to remove the Comptroller General, an executive officer, under a standard similar to that governing the President's removal power over the Commission. *Compare* 31 U.S.C. § 701(e)(1) *with* 28 U.S.C. § 991(a). The possibility of removal, even if never actually invoked, represented an impermissible Congressional infringement on the autonomy of the Executive Branch. *Bowsher v. Synar*, 106 S.Ct. at 3190–91.

The dangers of undue entanglement between branches, or at least the appearances of such entanglement, are even greater in this case. The Commission wields considerable authority to set the penalties for criminal acts, and commissioners earn more than do federal district judges. These two features make appointment to, and service on the Commission desirable for federal judges, and the statute's mandate that three judges serve on the Commission creates the appearance, at least, that their desire to serve on the Commission could influence the decision making of some judges. That the President obviously controls the tenure of judges only in their roles as commissioners, not in their status as judges, does not alleviate this problem.

### CONCLUSION

The Sentencing Reform Act is unconstitutional.